UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ALF CLARK,
  Plaintiff,

vs.                                              No. 04-1409

EDDIE SOMOLIO, et al
  Defendants

## ORDER

This cause is before the court for consideration of the defendants motion for summary judgement. [d/e 39].

### I. BACKGROUND

The plaintiff, a federal prisoner, filed this lawsuit pursuant to *Bivens v.Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) claiming that his Eighth Amendment rights were violated at the Federal Correctional Institution in Pekin, Illinois. The plaintiff is suing five defendants in their individual capacities including: Clinical Director Eddie Samalio, Physicians Assistant Jackson, Physicians Assistant Harris Hansen, Clinical Director Dalmasi, and Clinical Director Angel Ortiz. The plaintiff says the defendants violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical condition. Specifically, the plaintiff alleges that surgery was approved to repair his hernia, but the defendants delayed the procedure for four years.

### II. FACTS

The defendants provided 61 paragraphs of undisputed facts with their motion. The plaintiff, who is proceeding pro se, did not directly respond to these allegations, but instead claims that ten of the facts asserted are not correct. The plaintiff does not state why the assertions are incorrect, nor does he point the court to any specific documentation in his Statement of Undisputed Facts. Therefore, the following facts are taken from the defendants' motion, the plaintiff's response and the provided documentation.

The plaintiff arrived at the Federal Correctional Institution in Pekin, Illinois (Herein FCI Pekin) in April of 2000 and still remains at this institution. Each of the named defendants was employed as a medical employee at some time during the plaintiff's incarceration.

The basis of the plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs is the defendants failed to have his right inguinal hernia surgically repaired. The plaintiff was also treated for a variety of other medical problems at FCI Pekin including kidney pain, a heart condition, gastroesphogeal reflux disease, glaucoma, abdominal pain, urination problems, nausea, cardiac arrhythmia, hypertension, chronic ear pain, neck pain, and headaches. However, the plaintiff says his complaint is based only on the defendants deliberate indifference to his hernia. (Def. Mot, Plain. Depo, p. 14).

1

Physician's Assistant Hansen says on December 19, 2002, the plaintiff told him he believed his hernia had increased in size since 1989 and he complained of pain that increased with standing, walking or exercise. (Def. Mot, Hansen Aff, p. 1) Hansen referred the case to Dr. Ortiz and prepared a form so the plaintiff's case could be considered by the Utilization Review Committee.  This committee determines the appropriateness of sending an inmate to an outside consultant for treatment that is not routinely provided at FCI Pekin.

Hansen says he saw the plaintiff on several other occasions, but the "plaintiff never complained to me against regarding the same type of pain that was clearly connected to his inguinal hernia." *Id.*  Hansen says he also never believed any subsequent complaints of pain were related to the hernia, but instead to possible kidney stones and this possibility was "thoroughly investigated." *Id.* Hansen further notes that he never refused pain medicine to the plaintiff and the plaintiff never asked him for stronger medications.

Dr. Ortiz was a staff physician at FCI Pekin from April 7, 2002 to November 3, 2002 and from January 24, 2005 to March 3, 2006. Dr. Ortiz says he reviewed the note for P.A. Hansen and spoke to the plaintiff on the next day, December 20, 2002.  The plaintiff told the doctor that his "hernia was occasionally painful in his groin area during the last month." (Def. Mot., Ortiz Aff., p. 1).

Dr. Ortiz says on January 8, 2003, the Utilization Review Committee considered the plaintiff's hernia.  The committee determined the plaintiff's condition was a "level three, priority four condition." *Id.*   Level three is considered "medically acceptable- but not medically necessary is treatment that is not exclusively for the convenience of the patient (routine hernia repair, noncancerous kin lesions, etc.)" (Def. Memo, Group Ex. #1, p 2).  Dr. Ortiz says:

> Plaintiff's condition was considered a low priority because the inguinal hernia was fully reducible without warmth or swelling.  A hernia of this type may cause occasional discomfort and restrict a patient's physical activity, but is not considered medically urgent.  Of the various medical complaints that plaintiff was being treated for (chest pains associated with pericarditis, gastroesphogeal reflux disease, glaucoma, abdominal pain, cardiac arrhythmia), his hernia was considered the least significant health risk. (Def. Memo, Ortiz Aff., p. 1)

On September 24, 2003, Dr. Ortiz says he chose to defer repair of the plaintiff's hernia...

> "until procedures investigating his kidney stones were concluded because it was my personal opinion that the potential kidney problems raised more significant medical issues than his hernia.  Proceeding with the hernia repair would have extended and complicated efforts to properly diagnose and treat kidney stones. *Id.*

Dr. Ortiz says the plaintiff received on-going medical care for various other complaints, but did not complain of symptoms associated with his hernia again before Dr. Ortiz left FCI Pekin.  Dr. Ortiz says he left on November 3, 2003, and returned on January 25, 2005.

2

Dr. Ortiz says he was not made aware of any ongoing hernia problem until the plaintiff mentioned it to Dr. Ortiz again in May of 2005. Dr. Ortiz said that the plaintiff would first need to be evaluated by a cardiologist. The plaintiff saw a cardiologist who ordered additional tests. Upon the completion of those tests, the cardiologist cleared the plaintiff for hernia surgery. This was the last contact Dr. Ortiz had with the plaintiff concerning his hernia. Dr. Ortiz says medications were prescribed for the plaintiff's medical conditions and the plaintiff never complained to Dr. Ortiz that his pain medication was inadequate.

Dr. Dalmasi was a staff physician from June 1, 2003 from November 27, 2004. Dr. Dalmasi says he saw the plaintiff for medical complaints such as nausea and chest pain, but the first person to mention the plaintiff's hernia was the plaintiff' urologist. The urologist examined the plaintiff on December 29, 2003 and speculated that the hernia might be contributing to some of the plaintiff's "right flank pain.' (Def. Memo, Dalmasi Aff, p. 1) The urologist recommended a CT scan and cystoscopy which were approved as well as Tylenol for the plaintiff's abdominal pain. Dr. Dalmasi says on January 21, 2004 he "explained to plaintiff that due to his multiple medical complains, he could not take anti-inflammatories for pain and Tylenol was the safest option." *Id.*

Dr. Dalmasi says the plaintiff's chest pains led to a consultation with a cardiologist who conducted additional testing on the plaintiff on March 5, 2004. The plaintiff also underwent testing recommended by the Urologist on April 5, 2004. The plaintiff was not approved for hernia repair until the conclusion of this testing.

On June 25, 2004, Dr. Dalmasi re-submitted a consultation for the plaintiff to be seen by an outside doctor, Dr. Reid, for surgical repair of his hernia. In July, 2004, the plaintiff complained on two occasions of dizziness, chest pain and heart jumping. (Def. Mot, Ex A, p. 78) The plaintiff went through a pre-operative evaluation and no problems were detected. However, Dr. Dalmasi says the hernia surgery did not take place.

> [W]hen the plaintiff went to Dr. Reid's office for the procedure on
> August 3, he complained of chest pains and Dr. Reid canceled the procedure
> and told me that plaintiff would have to be stable and asymptomatic before
> he would repair the hernia. *Id.*

The plaintiff complained of chest pains again on October 11, 2004. He was examined by Dr. Dalmasi who says he reminded him that he had to be free of chest pain before Dr. Reid would consider operating. Dr. Dalmasi says this was the end of his contact with the plaintiff concerning his hernia. Dr. Dalmasi says it was Dr. Reid's decision not to repair the plaintiff's hernia and Dr. Dalmasi says he does "not have authority to order physician consultants to perform surgery despite their medical opinion that the surgery is not appropriate." *Id.* at 2.

The plaintiff's medical records show that he was seen and treated for chest pains throughout his incarceration. The plaintiff admits he has had as many as 20 EKG's while at FCI Pekin to monitor his heart. (Def. Mot, Plain. Aff, p. 24-25) The EKG's were scheduled even thought the plaintiff has not requested them.

On May 24, 2005, the plaintiff was seen at HeartCare Midwest for pre-operative clearance for hernia surgery. The doctor recommended further testing. Upon the completion of this testing,

3

the plaintiff was again given the go ahead and Dr. Ortiz requested the surgery on August 10, 2005. On January 11, 2006, the plaintiff complained of further chest pains and an EKG was performed.

The plaintiff was again seen by Dr. Reid on March 20, 2006 who noted that the plaintiff "occasionally gets pain but this is not a consistent problem." (Def. Mot., Ex. A, p. 107-108). In addition, the doctor noted "no nausea, vomiting, fever, chills, chest pain, shortness of breath, night sweats, weight loss, change in bowel or urinary habits, or other difficulties." *Id.* The surgery was approved by the Utilization Review Committee on March 29, 2006.

On May 26, 2006, the surgeon who was scheduled to perform the operation, Dr. Reid, again asked for a cardiology consult prior to surgery. After the testing, the plaintiff did have surgical repair for his hernia on December 14, 2006. (Def. Mot, Ex. G).

Defendant Robert Jackson says he was a Physicians Assistant at FCI Pekin from October 1, 1994 to September 30, 3006. The defendant says he has reviewed the plaintiff's medical records and says he did not examine the plaintiff regarding his hernia. Furthermore, even if he had, the defendant says he could not approve referrals for outside medical care and could not prescribe controlled pain medications.

Defendant Samalio says he was Health Services Administrator at FCI Pekin from September 2, 1005 to June 10, 2006. The plaintiff says his duties included preparing and managing the budget, reviewing and approving purchases and scheduling staff. The defendant says he does not make clinical decisions or schedule inmates for consultations with outside physicians. The defendant says he did not treat the plaintiff or provide medical care, but is a member of the Utilization Review Committee. Samalio states his job on the committee was to advise members as to administrative matters and not to take a position on medical procedures.

The court notes that the plaintiff filed this lawsuit on December 1, 2004, two years before his hernia surgery.

### III. LEGAL STANDARD

The entry of summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A "material fact" is one that "might affect the outcome of the suit.*"  Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the nonmoving party. *Id.*

A party moving for summary judgment initially has the burden of showing the absence of any genuine issue of material fact in evidence of record. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153 (1970)*; Schroeder v. Barth, Inc.,* 969 F.2d 421, 423 (7th Cir. 1992). A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position*. Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). "Summary judgement is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgement must be granted." *Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994).

### IV.  ANALYSIS

The defendants argue the evidence demonstrates that they did not violate the plaintiff's Eighth Amendment rights. The defendants argue that the plaintiff did not suffer from a serious medical condition and the defendants were not deliberately indifferent to his condition.

A. SERIOUS MEDICAL CONDITION

The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id*. The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.* On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

The defendants argue that the evidence before the court demonstrates that the plaintiff's hernia was not serious. The Utilization Review Committee had identified the plaintiff's hernia surgery as a "level three" surgery meaning it was "medically acceptable- but not medically necessary." (Def. Memo, Group Ex. #1, p 2). Dr. Ortiz further stated that the type of hernia the plaintiff had may "cause occasional discomfort," but was "not considered medically urgent." Dr. Ortiz noted that many of the other medical problems the plaintiff complained of were considered far more serious. (Def. Memo, Ortiz,Aff., p. 1)  Even the outside doctor, Dr. Reid, who was scheduled to perform the surgery repeatedly refused to proceed until the plaintiff's other medical conditions were stabilized.

The plaintiff argues that the mere fact that the doctors had approved him for surgery demonstrates that his medical condition was serious. The plaintiff further states that this surgery was delayed four years while he suffered with pain. The plaintiff says the defendants did not adequately record his complaints related to hernia pain. In addition, the plaintiff maintains that Dr. Reid canceled his surgery because he did not have the plaintiff's medical records. Despite the plaintiff's claim concerning the medical records, he has presented no evidence to support this claim. All of the records provided by the plaintiff repeatedly inform him that the reason his hernia surgery had been delayed on each occasion was due to concerns over his more pressing health issues including heart and kidney problems.

The court need not decide whether or not the plaintiff can demonstrate that he suffered from a serious medical condition because the plaintiff has failed to present evidence that the defendants were deliberately indifferent to his medical condition.

B.  DELIBERATE INDIFFERENCE

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference*.*   *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In

addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6.  However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

In addition, "a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established in order for liability to arise under 42 U.S.C. §1983." *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981).  The doctrine of *respondeat superior* (supervisor liability) does not apply.  *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). "(A) supervising prison official cannot incur §1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance v Peters,* 97 F.3d 987, 992 (7th Cir. 1996).

The defendants argue that the plaintiff has failed to show that Defendant Physician's Assistants  Hansen and Jackson were deliberately indifferent to his serious medical condition. Although Hansen treated the plaintiff on several occasions, the plaintiff only directly complained about his hernia on one occasion. Defendant Hansen then referred the plaintiff to a doctor who saw the plaintiff the next day and he also prepared a Utilization Review form.  Defendant Hansen  says he treated the plaintiff for a variety of subsequent ailments, but none that Hansen attributed to a hernia.

The defendants argue that Defendant Physician's Assistant Jackson has no personal involvement in the plaintiff's claims as he never examined the plaintiff regarding his hernia.  Neither defendant Hansen nor Defendant Jackson had authority to approve referrals to an outside physician. The plaintiff does not directly respond to the defendants claims concerning either Defendant Hansen or Defendant Jackson.  Instead, the plaintiff maintains that it was the "collective indifference" of the defendants that lead to the delay in his surgery. (Plain. Memo, p. 7).

The plaintiff has failed to present any evidence that Defendant Hansen or Jackson were personally responsible for his alleged constitutional violations.   In addition, the "collective" care received by the plaintiff shows anything but deliberate indifference:

1/19/02     complains to Defendant Hansen about hernia problems, hernia first noticed in 1989.
1/20/03     sees Dr. Ortiz
1/8/03   URC says plaintiff's hernia medically acceptable for outside consultation but not a medical necessity.
1/22/03   plaintiff complains of chest pains.
2/19/03     Dr. Ortiz approves request for consultation concerning potential heart problems.
4/23/03     plaintiff complains of chest pains, EKG ordered
5/30/03     ultrasound performed due to complaints of lower back pain.
6/24/03     approved for outside consultation, gastro-intestinal examination for gastroesophageal reflux disease.
8/2003   plaintiff undergoes examination for bladder and urethra, but urologist recommends further testing.  Utilization Review Committee approves testing.

| | |
|---|---|
| 9/24/03 | hernia repair deferred until investigation regarding kidney stones concluded |
| 12/29/03 | further testing with urologist, urologist says pain may be due to hernia. |
| 1/16/04 | Utilization Review Committee approves further testing |
| 1/21/04 | plaintiff complains of kidney pain, consults with doctor |
| 1/30/04 | plaintiff complaints of neck and chest pain |
| 3/1/04 | plaintiff taken to Midwest Urological for additional testing, but taken to wrong place and testing had to be reschedule. |
| 3/5/04 | plaintiff examined by outside cardiologist |
| 4/5/04 | testing with outside urologist. |
| 6/25/04 | doctor puts in request for hernia consultation |
| 7/2004 | plaintiff complaints of two more episodes of dizziness and chest pain |
| 8/3/04 | Dr. Reid was scheduled to perform hernia surgery, but based on plaintiff's complaints of chest pains the procedure was canceled. Dr. Reid said plaintiff need to be asymptomatic before surgery rescheduled. |
| 10/04 | plaintiff complains of chest pains |
| 11/18/04 | ultrasound conducted by Radiologist Associates. |
| 12/1/04 | lawsuit filed. |

It is clear the plaintiff believes his hernia repair surgery deserved to be given a higher priority, but the plaintiff's disagreement with the doctor's diagnosis is not a proper basis for an Eighth Amendment violation. The Utilization Review Committee did not believe the plaintiff's hernia surgery was a medical necessity. The doctors and committee members also clearly believed that the plaintiff's numerous other medical conditions such as heart and kidney problems deserved greater attention. The record demonstrates that the plaintiff did receive on-going care for these conditions including consultation and testing by outside physicians.

Most telling is that Dr. Reid, who is not a defendant in this case and is not employed by the Illinois Department of Corrections, also chose to delay the plaintiff's surgery on two occasions due to concerns over his heart condition. While the plaintiff claims this was due to the defendants failure to send complete medical records, the evidence before this court does not support that claim.

There is also no evidence before this court that the delay in performing the hernia repair surgery had a detrimental effect on the plaintiff's condition. Again, Dr. Reid's examination before the surgery notes that the plaintiff "occasionally gets pain but this is not a consistent problem." (Def. Mot., Ex. A, p. 107-108). In addition, the doctor noted "no nausea, vomiting, fever, chills, chest pain, shortness of breath, night sweats, weight loss, change in bowel or urinary habits, or other difficulties." *Id.*

The plaintiff has failed to demonstrate that any of the named defendants were deliberately indifferent to his serious medical condition and the defendants' motion for summary judgement is therefore granted.

**IT IS THEREFORE ORDERED that:**

**1) The defendants' motion for summary judgment is granted. [d/e 39]. The Clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed.**

**R. Civ. P. 56.  The case is terminated.  The parties are to bear their own costs.**

2) **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal** *in forma pauperis* **should set forth the issues the plaintiff plans to present on appeal.  See Fed. R. App. P. 24(a)(1)c.  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g)**

3) **The agency having custody of the plaintiff is directed to remit the docketing fee of $150.00 from the plaintiff's prison trust fund account if such funds are available.  If the plaintiff does not have $150.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $150.00 is paid in its entirety.  The filing fee collected shall not exceed the statutory filing fee of $150.00.**

4) **The plaintiff is responsible for ensuring the $150.00 filing fee is paid to the clerk of the court even though his case has been dismissed.  Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.  The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such change.**

5) **The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this __7th____ day of August,  2007.

                              **s\Harold A. Baker**

                        _____
                              HAROLD A. BAKER
                        UNITED STATES DISTRICT JUDGE